1
2
3
4
5
6
7
8                UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LESLIE MARIE McCULLEY,              No.  2:16-cv-2216 MCE DB P

12                Petitioner,

13        v.                             <u>FINDINGS & RECOMMENDATIONS</u>

14   DERRAL ADAMS,

15                Respondent.

16

17        Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a

18   writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges her 2013 conviction for

19   attempted premeditated murder of a police officer in the performance of his duties during which a

20   principal was armed with a gun (Count 1), evasion of police pursuit while personally using a gun

21   (Count 2), being a felon in possession of a gun (Count 3), and concealing or withholding a stolen

22   car (Count 4). Petitioner contends (1) the trial court committed instructional error, (2) evidence of

23   prior misconduct was improperly admitted, (3) the prosecutor committed misconduct, (4) there

24   existed cumulative error, and (5) the restitution order was erroneous. For the reasons set forth

25   below, this Court will recommend that the petition be denied.

26   ////

27   ////

28   ////

# BACKGROUND

## I.     Factual Background

The California Court of Appeal for the Third Appellate District provided the following factual summary of Petitioner's underlying case:

### The Pursuit and Shooting

In accordance with his usual practice of randomly checking the status of license plates while on patrol, an officer driving on Broadway in Sacramento on the morning of May 18, 2012, discovered that a Camry with four occupants was listed as stolen from Chico. He followed the Camry, requesting assistance. The Camry drove south through the Land Park neighborhood before doubling back northbound on Freeport Boulevard. By now, there was a procession of five or six police vehicles following it. The Camry turned into the parking lot at Sacramento City College and then suddenly accelerated, driving over the lawn and back onto the street. The police eventually called off the chase because it reached excessive speeds through the residential Hollywood Park neighborhood before the Camry turned into a schoolyard where children were taking recess outside. The Camry sped across the football field and through the perimeter fence to the street on the other side. A witness in the schoolyard could see that a man was driving the car.

Shortly afterward, a driver saw a car (which he called a Corolla) come screeching to a near stop on Meer Way just off Freeport. Two men jumped out. One ran off; the other stood around "trying to look rather nonchalant."

Officers reinitiated pursuit as the Camry sped north on Freeport. As they approached McClatchy High School, dispatch again cancelled the chase for reasons of public safety. Heading west on Second Avenue (the first through street), officers found the Camry abandoned near Marty Way and Fourth Avenue, pointed to that location along the way by pedestrians who had observed the route of the car. About three blocks away, another officer canvassing the neighborhood observed a man and a woman who were walking rapidly on Swanston Drive toward Riverside Boulevard. They caught his attention because they seemed out of place for the neighborhood (the man wearing a leather trench coat without a shirt). The woman was defendant.

The officer parked his car near them and got out. He asked them to approach him. The man immediately became upset and protested that he was not on parole. As he was backing up, he was feeling for something in his pants with one hand, and then stuck his other hand in his pocket. The officer, concerned about his safety, drew his gun and told the man to raise his hands. The man turned and headed quickly down Riverside. The officer followed after him as the man turned onto Robertson Way, with defendant trailing the officer. The officer thought it odd that the man was not really making a concerted effort to escape.

A canine officer arrived and took over the chase, sending his canine partner (Bodie) after the man, who had fled into a backyard. Officers were in the process of taking defendant into custody when they heard shots fired.

The canine officer had followed Bodie into the backyard. He saw Bodie run into the overgrown shrubbery after the man, who turned and fired a gun at the dog. The officer heard Bodie yelp, at which point the man turned to face the officer through the bushes. The officer heard a shot fired in his direction. The officer returned a volley of shots. The man fell, and the officer turned his attention to Bodie, who was bleeding profusely from the mouth. The officer drove Bodie to an emergency veterinary hospital in Rancho Cordova. The bullet had shattered Bodie's left jaw, severed his tongue, and fractured two bones in his paw. After two surgeries and extensive care, Bodie recovered from his injuries but was unable to resume his function as a canine partner.

Following the shots, the man's legs were visible on the ground under the bushes, but he was unresponsive to commands. After about 20 minutes, officers approached cautiously, not knowing if the man was still armed and lying in wait. Another canine partner, Rollo, was dispatched to drag him out of the bushes. Officers then determined the man was dead. He had a gun holster around his torso. There were eight bullet wounds, several of which were the obvious cause of rapid death. Blood tests showed that he had a high level of methamphetamine in his blood.

After struggling with police near the shooting, defendant was apprehended, handcuffed, and placed in a police vehicle. When questioned at the scene, she identified the man she was with as Lucas Webb, her boyfriend. She claimed to have been the driver of the Camry, in which they were the only two occupants. She asserted that her boyfriend did not have a gun in his possession. Shortly afterward, she admitted there had been two other passengers in the car, whom she had told to get out of the car. She later identified photographs of the two other passengers. Defendant's hands tested positive for gunshot residue.

That afternoon, the police conducted a lengthy formal interview of defendant. They initially withheld the information that Webb was dead. She told them the decedent had previously killed a police officer; he had an outstanding warrant and never complied with police efforts to initiate a contact (an attitude that she shared).[FN 2] Ordinarily he never let her drive, but she initially claimed that she had been driving the car (bragging about her repeated success in shaking police pursuits in Chico) until after they drove through the schoolyard. Ultimately, she admitted that Webb had been driving during the entire chase, which she had concealed to keep him from going to prison. Police then told her that Webb had died.

[FN 2: Decedent Webb's ex-wife confirmed defendant's characterization of him. After he had served a prison term, he was adamant that he would do anything to avoid going back to prison,

including killing a police officer if necessary. He frequently voiced an intense hatred of police, and would always evade police contacts.]

**Circumstances of Defendant's Personal Gun Use and Abetting the Shooting**

During her interview, defendant first claimed that she had brought the gun with them on the trip. However, after learning he had died, she said it was Webb's, which he carried in a holster. When the police commented on the stippling on her hand, she admitted that she had accidentally fired it during the course of the chase; she had taken it from Webb when he was grabbing for it to prevent him from using it. She then turned around to direct their protesting passengers to quiet down, and was "[wa]ving it around feloniously," though not aiming it at anyone in particular. When they had temporarily shaken off the pursuit, she told the passengers to take off their seatbelts and get out of the car when they stopped momentarily. In the process of abandoning the car, she accidentally shot out the rear passenger-side window. Webb had taken the gun from her at this point and stuck it back in his holster.

Defendant made several calls from jail that night. In the first, she mentioned that she had stayed with Webb when they released their passengers in order to help him. She had taken the gun away from Webb to keep him from using it, and fired it accidentally while abandoning the car (at which point he reclaimed it). During the second call, she repeated this account; she also noted that when they saw the police car after abandoning the Camry, she had told him, "You['re] always talkin' about, ... you got to get that motherfucker out Luc[a]s or throw it to me and I will." In the third call, she again mentioned taking the gun from him to keep him from using it, until he reclaimed it after she accidentally shot out the window. She also elaborated on the statement in her second call: "[I] told him 'cause he's always sayin',' 'he's g[o]nna shoot him in the face,' right. When ... the cops walked up on us ... I looked at him and said, 'Are you goin' to pull the motherfucker? If you don't want to pull the motherfucker, you better throw it back to me 'cause I'll handle that shit.' And that's the last thing I said to him just before he got shot dead." She added, "I coulda told him, 'Daddy, let's just fuckin' [be] in jail, it's just jail, let's fucking just ... lay down, let's give it up.' He woulda done it," and "[h]e'd still be [alive]." A couple of days later, she called one of her friends back. In describing their last contact before Webb ran off, defendant said she should have told him to surrender; instead, "he looked at me and he dropped his cell phone. And I told him, 'Go. You know what to do. If you don't do it throw it back to me and I'll get rid of 'em.' And he turned and ... [t]hat's the last thing I said to him." The officer who had pursued them on foot and the canine officer did not recall hearing any conversation between Webb and defendant, though this did not preclude any conversation having taken place.

The police interviewed one of the Camry passengers. He was a close friend of Webb. When on methamphetamine, Webb became out of control and bullheaded. The passenger also knew that Webb would do anything to avoid going to jail, and did not have any respect for

4

the police. The passenger told his interviewers that just before entering the schoolyard, defendant took off her seatbelt and turned around, pointing the gun at him and telling him to quiet down. She looked as if she were pointing the gun toward the rear window in the direction of their pursuers, telling the two passengers to duck down. However, she never fired the gun before he bailed out of the car. He thought she was encouraging Webb not to stop for anything. In a second interview, he made the same assertions, noting that he was not worried about her actually shooting him but of the possibility of a shootout. She may even have stuck the gun out the side window. He also thought she might have said something about shooting at the police. He expressed his concern to the police about being labeled a snitch.

At trial, however, the passenger testified he did not notice any gun until after they drove through the schoolyard, when he saw it in Webb's lap. Defendant took it at some point. After the schoolyard, she turned around in her seat, but did not point the gun at him, or toward the rear window, or stick it out of the window, since police were not behind them any longer. She never announced an intention to shoot at the police. He asserted it was Webb, and not defendant, who said they were not going to stop during the pursuit.

The passenger conceded that he had testified the opposite at the preliminary hearing—that it was defendant who said they were not going to be taken or stopped. He also conceded testifying that she pointed the gun at him, but that was inaccurate. He simply meant the gun was in her hand when she turned to face him. He acknowledged telling his interviewers and testifying that defendant stated she intended to shoot at the police, but that was an unintentional inaccuracy.

People v. McCulley, No. C075333, 2015 WL 1865705, at *1-4 (Cal. Ct. App. Apr. 21, 2015).

## II.     Procedural Background

### a.     Conviction and Sentence

Petitioner plead not guilty to the charges against her and was tried in the Sacramento County Superior Court in Case No. 12F03538. See Clerk's Transcript ("CT") Vol. 1 at 2. On September 11, 2013, the jury returned a guilty verdict on the following counts: attempted premeditated murder of a police officer engaged in the performance of his duties and while a principal (Petitioner) was armed with a firearm, in violation of California Penal Code § 664/187, § 664(a), § 664(e)(1), and § 12022(a)(1) (Count 1); evading a peace officer in a motor vehicle while personally using a firearm, in violation of § 2800.2 and § 12022.5(a)(1) (Count 2); being a felon in possession of a firearm, in violation of § 29800(a)(1) (Count 3); and unlawfully concealing a stolen vehicle, in violation of § 496d(a) (Count 4). See CT Vol. 5 at 1364-68.

5

On November 22, 2013, Petitioner was sentenced to an indeterminate term of 15-years-to-life consecutive to a 16-year determinate sentence. CT Vol. 5 at 1478-81. She was also ordered to pay restitution, including $55,191.41 to the City of Sacramento for injury to the police canine. See Reporter's Supp. Transcript ("RST") Vol. 1.

**b.      Direct Review**

Petitioner sought review in the California Court of Appeal Third Appellate District, which affirmed the judgment on April 21, 2015, with directions to the trial court to issue an amended abstract of judgment due to clerical error. Lodged Doc. ("LD") 4. She then sought review in the California Supreme Court, which summarily denied review on July 15, 2015. LD 8.

**c.      Collateral Review**

Petitioner filed this petition for writ of habeas corpus pursuant to 42 U.S.C. § 2254 on September 19, 2016, and Respondent filed an Answer on January 5, 2017. (ECF Nos. 1, 13.) Petitioner filed a traverse on May 15, 2017. (ECF No. 21.) The petition is fully briefed and ready for disposition.

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. at 1451. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06). "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411;

see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (Internal citations and quotation marks omitted.)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

There are two ways a petitioner may satisfy subsection (d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient and the state court opinion may not be entitled to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

The second test, whether the state court's fact-finding process is insufficient, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised."). For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review

the claim de novo.  <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006); <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056 (9th Cir. 2003).

**ANALYSIS**

Petitioner presents five grounds for relief from her conviction: (1) the trial court erred when it provided a "confusing" instruction on the aiding and abetting attempted murder charge and refused Petitioner's request for a clarifying instruction, (2) the trial court erred when it failed to provide a unanimity instruction, (3) the trial court erred when it admitted "other crimes" evidence, (4) the prosecutor's legal theory was inadequate and constitutes reversible misconduct, and (5) the restitution award violated Petitioner's right to due process.

**I.     Instructional Error**

Petitioner presents two claims of instructional error. First, she contends that the trial court erred by providing confusing instructions as to aider and/or abettor liability and then refusing Petitioner's request for a clarifying instruction. Second, she argues that the trial court erred in failing to instruct on unanimity as to the personal use enhancement.

**A.     Aiding and Abetting Instruction**

**1.     Opinion of the California Court of Appeal**

The California Court of Appeal denied Petitioner's first claim of instructional error as follows:

> The benchmark for the mental state necessary for vicarious liability as an aider and/or abettor of a crime comes from the venerable *People v. Beeman* (1984) 35 Cal.3d 547, 560: "[T]he weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator and with an intent ... either of ... encouraging or facilitating commission of[ ] the offense." As *People v. Croy* (1985) 41 Cal.3d 1 subsequently took pains to restate, vicarious liability rests on "the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense." (*Id.* at p. 12, fn. 5, italics added; accord, *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122 (*Mendoza*) [mental state necessary for vicarious liability "is different from the mental state necessary for conviction as the actual perpetrator" (italics added)].) The pattern jury instruction on this point (CALCRIM No. 401) is a correct statement of the holding of *Beeman*. (*People v. Perez* (2005) 35 Cal.4th 1219, 1234; *People v. Tillotson* (2007) 157 Cal.App.4th 517, 532 [both finding prior pattern instruction correctly states the law]; see *People v. Houston* (2012) 54 Cal.4th 1186, 1224 [an accomplice "shares the perpetrator's specific intent " (italics added)

for the target offense when offering aid or encouragement with knowledge of purpose; citing prior and present pattern instructions as equivalents with approval as reflecting *Beeman* criteria].)

In the present case, the trial court acceded to defendant's proposal to modify one paragraph in the pattern instruction as follows: "If ... defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact.... However, the fact that a person is present at the scene of a crime, *has knowledge that a crime is being committed*, or fails to prevent the crime does not, by itself, make her [vicariously liable]." (Italics added.) It rejected, however, another proposed addition to the pattern instruction: "You may not find [defendant vicariously] guilty ... unless she: [¶] 1. Actually knew and shared the full extent of [Webb's] criminal intent; [¶] 2. Actually promoted, encouraged, or assisted [Webb]; [and] [¶] 3. Did so with the intent and purpose of advancing [Webb's] successful commission of the crime. [¶] *It is not sufficient* if [a] person simply gives assistance with knowledge of [a] perpetrator's purpose. Merely giving assistance without sharing the perpetrator's purpose *and intent* establishes liability only as an accessory, not as an accomplice." (Italics added.) The trial court concluded this was cumulative of the pattern instruction, argumentative, and confusing in its injection of the irrelevant issue of accessory liability. The court disagreed with counsel that an accomplice must share an intent to kill as opposed merely to offering knowing aid or encouragement of another's intent to kill.

At great length, defendant asserts that the Supreme Court has modified the criteria of *Beeman*—apparently sub silencio—to require that vicarious liability arises only where an accomplice actually shares the specific intent of the perpetrator for the target offense, i.e., specific intent to kill, rather than simply knowing of this specific intent. As her defense was a lack of any personal intent to kill (or to have Webb kill), she argues the refusal of her proposed modification was reversible error.

Contrary to defendant's characterization, there has not been any "confusion" in the intervening 30 years about the straightforward *Beeman* criteria (except in the briefs of defendants seeking to establish instructional error) that either *People v. Lee* (2003) 31 Cal.4th 613 or *Mendoza* addressed and resolved in favor of defendant's present argument. All *Mendoza* held was that the different specific intent necessary for vicarious liability, knowing assistance or encouragement, was indeed a species of the specific intent subject to defeasance by reason of voluntary intoxication. (*Mendoza*, *supra*, 18 Cal.4th at p. 1129.) It did not hold that an accomplice must share the specific intent for the target offense. That the People's brief in *Mendoza* may have misconstrued this principle (as defendant asserts) is not of any moment to the criteria from *Beeman* as incorporated in the pattern instruction.[FN 3] As for *Lee*, defendant's selective quotation elides *Lee*'s reaffirmation of the point made in both *Croy* and *Houston*; while *Lee* indeed states that "the person guilty of attempted murder as an aider and abettor must intend to kill" (*People v. Lee*, *supra*, 31 Cal.4th at p. 624), this was prefaced with the explanation that an accomplice satisfies the element of the

specific intent of the crime at issue (premeditated attempted murder) when offering assistance or encouragement with knowledge of the direct perpetrator's purpose, and therefore those who encourage or assist in a premeditated attempted murder are sufficiently blameworthy to be subject to the same punishment even without premeditating the crime on their own part (*Lee*, at p. 624). Thus, the different specific intent for the vicarious liability of an accomplice to which *Houston*, *Mendoza*, *Lee*, and *Croy* have all adverted is not and never will be the specific intent that is an element of the target crime. To the extent defendant's special instruction communicated this alternate standard and was not objectionable on any other grounds, the trial court properly rejected it as an incorrect statement of the law.

[FN 3: The jury's confusion when "correctly instructed" on the *Beeman* criteria in *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1227–1228, is equally immaterial to defendant's argument because the case does not remotely suggest that there is any problem with the manner in which the pattern instruction states the criteria.]

People v. McCulley, No. C075333, 2015 WL 1865705, at *4-6 (Cal. Ct. App. Apr. 21, 2015).

## 2. Discussion

Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); see also Williams v. Calderon, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. Francis v. Franklin, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000); Richardson v. Marsh, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors

follow their instructions"); see Francis, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous, but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. Estelle, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. Id. at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." Id. Habeas relief is only available when the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); California v. Roy, 519 U.S. 2, 5 (1996).

Petitioner's argument is premised on the purported "confusion" following the California Supreme Court's decision in People v. Beeman, 35 Cal.3d 547, 560 (1984), which held that an aider and abettor is liable only when they "act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose of either committing, or of encouraging or facilitating commission of, the offense." (Emphasis in original.) The court went on to say: "[A]n appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." Id. at p. 561. Beeman's definition of aiding and abetting, and of what it means to share the perpetrator's specific intent, remains good law to this day. See, e.g., People v. Nguyen, 61 Cal 4th 90, 119 (2015); People v. Delgado, 56 Cal.4th 480, 486 (2013); People v. Houston, 54 Cal. 4th 1186, 1224 (2012); People v. Marshall, 15 Cal. 4th 1, 40 (1997); People v. Prettyman, 14 Cal. 4th 248, 259 (1996). CALCRIM No. 401, as given here, adequately conveys those principles. See People v. Houston, supra, 54 Cal. 4th at 1224.)

Notwithstanding <u>Beeman</u>'s explicit holding, Petitioner argues that "confusion remained as to precisely what one must intend in order to be derivatively liable for a crime committed by another" because subsequent cases have held that an aider and abettor of a crime that has an intent-to-kill element must also personally intend to kill. <u>People v. Mendoza</u>, 18 Cal. 4th 1114 (1998); <u>People v. Lee</u>, 31 Cal. 4th 613 (2003). Therefore, she asserts that the trial court should have allowed a clarifying instruction.

The cases relied on by Petitioner do not support her argument. Instead, the court in <u>People v. Mendoza</u> specifically held that "[t]he mental state necessary for conviction as an aider and abettor ... is different from the mental state necessary for conviction as the actual perpetrator. [¶] The actual perpetrator must have whatever mental state is required for each crime charged.... An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" <u>People v. Mendoza</u>, supra, 18 Cal. 4th at 1122-23 (quoting <u>Beeman</u>, supra, 35 Cal. 3d at 560).

Similarly, <u>People v. Lee</u> reaffirmed the holding of <u>Beeman</u> stating: "When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[ ] the full extent of the [direct] perpetrator's criminal purpose and [must] give[ ] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.'" <u>People v Lee</u>, supra, 31 Cal. 4th at 624 (quoting <u>Beeman</u>, supra, 35 Cal. 3d at 560). The court went on to explain that, "[t]hus, to be guilty of attempted murder as an aider and abettor, ... [one] must intend to kill." <u>People v. Lee</u>, supra, at 624. It is this explanatory statement on which Petitioner relies. But, read in context, it is clear that <u>Lee</u> did not change the law. To the contrary, it approved the formulation of intent necessary to establish aiding and abetting stated in <u>Beeman</u> and incorporated into CALCRIM 401.

That <u>People v. Lee</u> merely restated the law is supported by the California Supreme Court's recent citation of this explanatory statement in <u>People v Gonzalez</u>, 54 Cal. 4th 643, 653 (2012). There, the court noted the following in a footnote:

> An accomplice can be guilty of attempted murder if the accomplice aids and encourages an attempted murder knowing of the direct perpetrator's intent to kill and intending to facilitate the killing. (*People v. Lee* (2003) 31 Cal.4th 613, 624; *People v. Prettyman* (1996) 14 Cal.4th 248, 259.) **In other words**, "the person guilty of attempted murder as an aider and abettor must intend to kill." (People v. Lee, at p. 624.)

People v. Gonzalez, supra, 54 Cal. 4th at 654 n.8 (emphasis added). Thus, the "confusion" that Petitioner claims exists appears to be based on a misreading of these cases. As discussed, they stand only for the unremarkable proposition that an aider and abettor is liable only if she has knowledge of the perpetrator's specific intent to commit a particular crime and she intends for her own actions to facilitate the commission of that crime. Petitioner's attempt to conflate the crime of attempted murder with aiding and abetting the commission of that crime is unavailing.

In any event, the appellate court determined that the instructions as given on the whole comported with state law. The court noted that California law requires the aider and abettor to share the specific intent of the perpetrator, and the pattern jury instruction on this point (CALCRIM No. 401) is a correct statement of the holding of Beeman. Pursuant to CALCRIM No. 401, in order to find Petitioner guilty based on aiding and abetting, jurors had to find beyond a reasonable doubt that Webb intended to kill an officer; that Petitioner knew that he intended to kill the officer; and that Petitioner intended to aid Webb to kill the officer. Thus, the appellate court determined that the instructions as a whole clearly and unmistakably required the jury to make an individualized determination of Petitioner's mental state. Since the appellate court determined that the instructions comported with California law, and the mental state required for aiding and abetting liability is a matter of state law, federal habeas relief is foreclosed. Estelle, 502 U.S. 62, 68 ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.").

Even if this Court reviewed the instruction, Petitioner's claim would fail. CALCRIM No. 401, as given by the trial court, instructed the jury that it must find that Webb committed the crime; Petitioner knew that Webb intended to commit the crime; Petitioner, before or during commission of the crime, intended to aid and abet Webb in committing the crime; and Petitioner's words or conduct did in fact aid and abet Webb commission of the crime. The jury

15

was further instructed that someone aids and abets a crime "if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." CT Vol. 5 at 1336. Petitioner fails to demonstrate that the jury was not sufficiently instructed on the requirements under California law concerning the mental state of the aider and abettor.

Accordingly, Petitioner's claim of instructional error should be rejected.

**B.    Unanimity Instruction**

Petitioner next argues that her due process rights were violated when the trial court failed to provide a unanimity instruction for the personal use enhancement.

**1.    Opinion of the California Court of Appeal**

The California appellate court denied Petitioner relief on this claim as follows:

> **1.2 Lack of a Unanimity Instruction for the Finding on Personal Use**
>
> Defendant contends the evidence of her behavior during the police pursuit of the car includes multiple alternative instances on which the jury could base the enhancement for personal use of a gun. She contends the trial court was thus obligated (in the absence of an express election on the part of the prosecutor) to instruct on the need for the jury to agree unanimously on the factual basis for the enhancement.
>
> Where there are alternative factual bases for an offense, the prosecution must affirmatively communicate to the jury an election of the act on which it bases the count with a "clarity and directness" sufficiently akin to an instruction; otherwise, the trial court must instruct the jury on the need to agree unanimously on the factual basis. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1536, 1539.)
>
> In his opening remarks, the prosecutor referred to defendant shooting out the rear passenger window with the gun during the pursuit. In closing arguments, the prosecutor first pointed out that defendant admitted waving the gun around "feloniously" in the car. He then referred to the passenger's police interview (describing defendant as pointing the gun at him and toward the rear window while issuing orders) as evidence that defendant was working as a team with Webb. The prosecutor also argued defendant's claim of accidentally firing the gun only after abandoning the car did not account for all the empty casings in the gun, a neighbor's failure to hear a gunshot at that location, and the absence of any broken glass outside the car, which in his view meant that she must have fired it through the window before that point, although "[s]he's not charged with the discharge in the car" (an adumbrative remark probably referencing the absence of a substantive offense based on the fact). The only

express reference to the enhancement came in his final remarks, where he again argued that she must have shot out the window at some earlier point, and "That's a personal use of a firearm during the evasion. She used it during the evasion." He also contended that not only was this action relevant to the "personal arming issue with the assistance of the high-speed chase," this established an attitude relevant to the charge of attempted murder.

The court instructed the jury it could base the enhancement on either displaying the gun in a menacing manner, or on firing the gun. It did not instruct that the jury must unanimously agree on the act underlying the enhancement. During the jury's deliberations, at least two jurors were concerned with the definition of "menacing" (the trial court responding that it should be given its ordinary meaning).

In *People v. Norman* (2007) 157 Cal.App.4th 460, this court observed that the absence of a unanimity instruction "is the most common kind of instructional error in criminal cases." Consequently, this court advised that trial courts should automatically include one unless there is some good reason not to give it in the particular case. (*Id.* at p. 467.)

The prosecutor's passing comments connecting the circumstantially established firing of the weapon during the pursuit with the enhancement hardly seem sufficiently akin to an instruction to that effect. However, even if this fails to pass muster as a direct and clear express election, we agree that the error to instruct on unanimity is harmless beyond a reasonable doubt.

The People urge us to apply the principle under which the failure to instruct on unanimity is harmless where the acts are so closely related in time and place that a jury could not reasonably have distinguished among them and therefore must have believed or rejected the evidence in toto, or there was only a single defense offered; we agree with defendant that this principle does not apply here where different witnesses testified about different acts. (*People v. Melendez* (1990) 224 Cal.App.3d 1420, 1430–1431.) The jury had at least three different conflicts to resolve: whether to credit defendant's explanation for the broken window or the prosecution's circumstantial alternative; whether to believe the passenger's original account or his testimony at trial; and which of the actions the passenger attributed to defendant to accept—pointing the gun at him, pointing the gun at the rear window, or pointing the gun outside the car.

However, by her own admission, defendant at least waved the gun around in the car in front of the others "feloniously" while ordering the passengers to quiet down. Thus, even if she did not point it at anyone or fire it through the window during the pursuit, this would be sufficient to sustain the enhancement for an implied menacing display. (*See People v. Jacobs* (1987) 193 Cal.App.3d 375, 381.) We cannot find any reasonable basis for properly instructed jurors to reject this incriminating admission (despite the passenger's disingenuous testimony at trial that defendant merely kept the gun in her lap), as it is not self-impeaching, inherently improbable, the result

17

of evident bias, or has any other logical basis for doubt. (*South Bay Transportation Co. v. Gordon Sand Co.* (1988) 206 Cal.App.3d 650, 657; *Camp v. Ortega* (1962) 209 Cal.App.2d 275, 281 [trier of fact cannot reasonably reject the uncontradicted testimony of a witness].) As a result, we conclude that any jury would inevitably sustain the enhancement if instructed to agree on its factual basis, and retrial would be an idle act.

People v. McCulley, No. C075333, 2015 WL 1865705, at *4-6 (Cal. Ct. App. Apr. 21, 2015).

### 2. Discussion

The Supreme Court has held that there is no federal constitutional right to a unanimous verdict. Apodaca v. Oregon, 406 U.S. 404, 406 (1972). Nor is there a "general requirement that the jury reach agreement on the preliminary factual issues which underly the verdict." Schad v. Arizona, 501 U.S. 624, 631-32, 645 (1991). In the absence of clearly established Supreme Court law supporting Petitioner's claim, therefore, the state court's denial of the claim cannot be contrary to, or an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1); Carey v. Musladin, 549 U.S. 70, 77 (2006).

Even if the failure to give a unanimity instruction was erroneous, instructional error can form the basis for federal habeas corpus relief only if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (citing Cupp v. Naugh'ten, 414 U.S. 141, 146 (1973)); Henderson v. Kibbe, 431 U.S. 145, 154 (1977). "The burden on the habeas petitioner is especially heavy where, as here, the alleged error involves the failure to give an instruction." Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting Estelle, 502 U.S. at 72). Jury instructions cannot be judged in isolation, however. Estelle, 502 U.S. at 72. Rather, they must be considered in the context of the entire trial record and the instructions as a whole. Id.

Petitioner argues that the failure to provide a unanimity instruction violated her due process rights because there were several, separate factual bases argued by the prosecutor for the personal use enhancement: that Petitioner allegedly fired the gun at some point during the pursuit, that Petitioner waived the gun around feloniously, that Petitioner pointed it out the back window, and that Petitioner pointed it at one of the passengers. Even so, Petitioner does not dispute that she admitted to one of those factual bases during questioning by a detective. See CT Vol. 5 at

18

1242. Petitioner was asked if she was holding the gun during the chase, and she responded, "Yeah. Waiving it around feloniously." Id. Despite this unequivocal admission, Petitioner highlights the testimony of one of the vehicle's passengers, who claimed that Petitioner kept the gun in her lap. This contradictory testimony, though, does not result in constitutional error here because Petitioner's admission itself would have sufficed for a unanimous finding by the jury. Accordingly, "'the ailing instruction by itself [did not] so infect[ ] the entire trial that the resulting conviction violates due process.' [citation omitted]." Clark, 450 F.3d at 904.

The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Bell, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Accordingly, Petitioner is not entitled to relief as to this claim.

## II.      Evidence of Prior Misconduct

Petitioner next argues that the trial court erred when it admitted evidence of prior misconduct and that this error violated her constitutional rights.

### A.      Opinion of the California Court of Appeal

The California appellate court denied Petitioner relief on this claim as follows:

> **2.0 Evidence of a Previous Criminal Act Was Properly Admissible**
>
> **2.1 Background**
>
> Before trial, the prosecutor moved to admit evidence of a May 2010 incident that resulted in defendant's arrest. According to the offer of proof, an officer was pursuing a car; it crashed, and the officer saw the driver flee into a nearby residence. Occupants of the residence were not cooperative with police inquiries about the location of the driver or a demand to vacate the residence; the officer (along with support personnel) entered, continuing to identify themselves as they swept through the residence. The driver, whom officers found inside a closet, surrendered without any incident. On opening a second closet, the officers found defendant seated inside facing the door with a loaded (though half-cocked) revolver in hand. One of the officers immediately grabbed the gun away from her. In the opinion of the reporting officer, defendant would have fired the gun if not disarmed because she had an outstanding arrest warrant. Defendant told them she had taken the gun away from the fleeing driver to prevent him from firing it.

[fn 4 Although charged with assaulting an officer with a gun or exhibiting it to him (as well as obstruction), she ultimately pleaded only to being an accessory in July 2010, receiving a one-year jail term.]

However, in a postarrest interview in early May 2012 (the result of a traffic detention in Chico for failing to come to a complete stop, during which police found a simulated-revolver pellet gun, a large-caliber bullet, and controlled substances on her person), defendant spontaneously stated that she had intended to shoot at an officer at the time of the 2010 incident, but realized that with a single-action revolver she would wind up dead as a result. (The offer of proof indicated she made this statement in a boastful and amused manner.) Concerned about her "kids and things," she had surrendered the weapon to the officer.

The prosecution's motion argued that both cases reflected defendant's claim after arrest that she had taken possession of a weapon to disarm another, but reflected conduct indicating an intent to turn the weapon on police. Moreover, her 2012 interview occurred just before the present offense and demonstrated her attitude toward the prospect of shooting an officer. The prosecutor argued the evidence was consequently relevant to motive and intent.

At the hearing on the motion, defendant argued this evidence related to thoughts, not actions. She also asserted the speculations of officers involved in the 2010 incident were irrelevant. The trial court concluded the evidence was relevant to the material issue of intent, demonstrating similar behavior involving the use of guns in the presence of police officers (though it would not permit evidence of the speculations of the officers regarding defendant's intent). The court found the prior conduct was not unduly inflammatory compared to the present offenses, and that prejudice to defendant would not otherwise result.

The officers involved in the 2010 incident and the 2012 interview testified at trial consistent with the offer of proof. (The parties are in agreement on the substance of the testimony, so we do not need to elaborate on further details.) In addition, in an excerpt from a postarrest interview in the present matter (to which the jury listened), defendant asserted that she had taken the gun from the fleeing driver inside the residence in 2010 and aimed it at the police when they found her in the closet before she surrendered it to them. The trial court gave an appropriate limiting instruction that advised the jury it could—but was not required to—consider the evidence in deciding whether defendant acted with the intent to aid and abet Webb in the attempted murder of the officer, taking into account the extent to which the prior incident was similar to the present crime; the instruction prohibited the jury from considering bad character, predisposition, or any other purpose.

## 2.2 Analysis

Premised on her mistaken premise (which we have rejected) that the intent at issue in her trial is the specific intent to kill a police officer,

20

defendant contends this evidence was not relevant to a material issue. (She also renews her claim that she is being tried on the basis of irrelevant thoughts rather than relevant actions.) In conclusory fashion, she then argues this absence of probative value pales in the face of the inflammatory and prejudicial nature of the evidence of her 2010 conduct.

Evidence of uncharged misconduct is admissible pursuant to Evidence Code section 1101 if it is sufficiently similar to the crime at issue such that it gives rise to a rational inference of intent and does not give rise to a substantially greater risk of prejudice or confusion of the issues at trial. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328.) As with any evidentiary ruling, we review the trial court's decision for an abuse of discretion. (*Ibid*.)

The central issue at trial was the exact nature of defendant's intent in offering encouragement to Webb (as disclosed in her phone conversations). The 2010 situation rationally informs the resolution of this inquiry, in that defendant chose to lie in wait with a gun at the ready knowing that the police were searching the residence. While it is true a different set of circumstances precipitated this response, this does not affect the pertinent inferences of intent to be drawn from the nature of that response. If the intent with which she did this could even be considered equivocal, there is the evidence of her own statements (contemporaneous with the present offense) regarding her desire actually to use a gun on the police, and she apparently took pride in expressing her willingness to do so. Her only qualm was fear for her own safety, something not implicated in giving encouragement to another to do the actual shooting of an officer. These are hardly mere thoughts that are divorced from deeds; these thoughts accompanied conduct stopping just short of actually firing the gun at a police officer. Moreover, the evident fabricated nature of her excuse in the 2010 incident—seizing a gun to prevent its use— rationally informed the resolution of whether the identical claim in the present case was genuine. Thus, the evidence has substantial probative value in determining whether she intended to encourage another whom she knew intended to shoot at a police officer.

In *People v. Harris* (1998) 60 Cal. App. 4th 727, 738-739, we assessed factors pertinent to a determination of prejudice under Evidence Code section 1101 in the context of a different provision of that code governing admission of uncharged sex offenses; these include the inflammatory nature of the facts of the prior offense in comparison with the present offense, the possibility of jury confusion (such as where the uncharged acts went unpunished, leading to the temptation merely to punish a defendant for the present offenses), remoteness, and the need for an undue amount of court time in which to establish the prior facts. None of these factors establishes any form of prejudice in the present matter: The prior facts are far less inflammatory than actually shooting at a canine officer and maiming his canine partner, they are not remote, they did not require a significant amount of court time to establish, and the issue of her punishment (or more to the point, any indication she went unpunished) for the prior offense did not arise. As a result, we cannot

find an abuse of discretion on the trial court's part in admitting this evidence.

People v. McCulley, No. C075333, 2015 WL 1865705, at *6-8 (Cal. Ct. App. Apr. 21, 2015).

## B.    Discussion

A state court's evidentiary errors, absent some showing that the defendant's constitutional rights were violated as a consequence of those errors, do not give rise to cognizable federal habeas claims. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). The Ninth Circuit has recognized that the Supreme Court has never ruled that the admission of irrelevant or overly prejudicial evidence gives rise a violation of a defendant's due process rights. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, ... it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.").

In Estelle, the Supreme Court explicitly noted that "[b]ecause we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Case Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." 502 U.S. at 75 n.5. It has not settled the question in the intervening years and it remains an open issue. In the absence of clearly established federal law, the California Court of Appeal's rejection of this claim cannot be said to be objectively unreasonable within the meaning of § 2254(d)(1). Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.") (internal quotation marks and citations omitted).

Accordingly, Petitioner is not entitled to relief on this claim.

////

////

////

22

III.    **Prosecutorial Misconduct**

Petitioner also contends that the prosecutor committed prejudicial error by arguing that Petitioner could be liable for attempted murder if she had the intent to shoot an officer, even if she committed no acts in furtherance of that intent.

A.    **Opinion of the California Court of Appeal**

The California appellate court denied Petitioner relief on this claim as follows:

> **3.0 The Claim of Misconduct Is Forfeited**
>
> At the very end of his concluding argument, the prosecutor discussed defendant's cavalier attitude in talking with the Chico police about shooting at a police officer in 2010: "[S]he's laughing. She thinks it's funny." In the opinion of the prosecutor, "This is something she wants to do, but she didn't want to get shot back. That's not anything different than attempt[ed] murder."
>
> Defendant seizes on this isolated remark to claim this establishes prosecutorial misconduct resulting in reversible prejudice. She contends this allowed the jury to find her guilty of attempted murder on the basis of an intent to shoot, unaccompanied by any act of assistance or encouragement from Webb. Recognizing that trial counsel failed to object and request an admonition to the prosecutor's remark, she contends the forfeiture was the result of ineffective assistance of trial counsel that was reversibly prejudicial. Alternately, she contends the trial court had a duty sua sponte to address this misconduct. Finally, she asks that we exercise our discretion to reach a forfeited issue.
>
> Failure to lodge a contemporaneous objection and a request for an admonition forfeits any claim of prosecutorial misconduct unless a defendant affirmatively establishes that it was irremediable with more than a "ritual incantation" to this effect. (*People v. Panah* (2005) 35 Cal. 4th 395, 462.) Defendant cannot hope to establish that the remark at issue constituted irremediable misconduct.
>
> Defendant's attempt to reach the issue under the guise of ineffective assistance of trial counsel fails in two regards. In the first place, direct appeal is almost inevitably the inappropriate forum for establishing that the inherently tactical choice of failing to raise an objection to misconduct in closing argument fell below reasonable professional standards. (*People v. Lopez* (2008) 42 Cal. 4th 960, 966, 972.) In the second place, defendant does not provide anything more than a perfunctory analysis of how the failure to object did not meet objective professional standards or resulted in the necessary prejudice, without any consideration of the remainder of closing argument or the instructions. "This will not suffice." (*People v. Mitchell* (2008) 164 Cal. App. 4th 442, 466-467 [rejecting claim of ineffective assistance on this basis].)

In casting the issue as a failure on the part of the trial court to satisfy a duty to address misconduct sua sponte, defendant stands precedent on its head. *People v. Ponce* (1996) 44 Cal. App. 4th 1380, while speaking in terms of "duty," was in fact a situation in which the trial court took action to address factually unsupported argument on the part of defense counsel under its discretionary powers to ensure the orderly administration of justice. (*Id.* at pp. 1387–1388.) Nothing in the case imposes a duty on a trial court to address purported misconduct in argument sua sponte.

Finally, although we have discretion to consider an issue regardless of forfeiture, this applies only where it raises a question of law on such undisputed facts as appear in the record on appeal. (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal. App. 4th 68, 73; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 415, pp. 473–474.) This is a disfavored course of action; it is unjust to the opposing party, unfair to the trial court, and contrary to judicial economy (i.e., a waste of the time of the parties and the judicial branch) since it encourages the embedding of reversible error through silence in the trial court. (*Saville v. Sierra College* (2005) 133 Cal. App. 4th 857, 873.) As a result, we ordinarily exercise our discretion to excuse forfeiture "rarely and only in cases presenting an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) The circumstances of the present case hardly satisfy this stringent criterion. As a result, the claim of prosecutorial misconduct is not cognizable in this appeal.

People v. McCulley, No. C075333, 2015 WL 1865705, at *8-9 (Cal. Ct. App. Apr. 21, 2015).

## B.     Discussion

Because the state appellate court found Petitioner's prosecutorial misconduct claim forfeited under California's contemporaneous objection rule, this claim is procedurally defaulted from federal habeas review. Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment). The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. See, e.g., Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004). The state appellate court's holding that this claim was thereby forfeited under California's contemporaneous objection rule means that it may be deemed procedurally defaulted in these proceedings as well.

Even if not defaulted, Petitioner's claim fails because there is no basis to conclude that the prosecutor's comment rendered the entire trial unfair. The gravamen of Petitioner's argument is

24

that the prosecutor's statement allowed the jury to punish plaintiff for her thoughts absent a concurrent act in furtherance of those thoughts. As the appellate court noted, however, the prosecutor's statement cannot be viewed in isolation. Reading the prosecutor's closing argument in its entirety underscores any claim of prejudice since the prosecutor repeatedly references the correct aider-and-abettor theory of liability. At one point, the prosecutor asks the jury, "So what does somebody have to do to aid and abet? Somebody aids and abets a crime if she knows of the perpetrator's unlawful purpose. She clearly knows his unlawful purpose, and she specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the commission of the crime." Reporter's Transcript ("RT") Vol. 4 at 1064. The prosecutor then painstakingly proceeded through each of these elements and repeatedly returned to them.

Regarding the knowledge element, the prosecutor highlighted Petitioner's own statements acknowledging that she was aware of Webb's intent to kill an officer. During the chase, Petitioner allegedly said to Webb, "You always talk about it," with "it" referencing killing a cop. See RT Vol. 4 at 1064-65. During an interview after her arrest, Petitioner described Webb, stating "He's going to shoot the cop in the face and take his gun and ammunition, and I know he's a man of his mother fuckin' word." Id. at 963. During a recorded call with her father, the Petitioner attributed the following statement to Webb: "I'm going to spray this mother fucker in the face, and he went to pull the 357." See id. at 965. Per the prosecutor, "This is not ambiguous. She's communicating She knows exactly what he wants to do, and she's communicating that he needs to do it." Id. at 1066. These statements were intended to show that Petitioner had the requisite knowledge of Webb's intent to kill an officer.

But the prosecutor went further, arguing that not only was Petitioner aware of Webb's intent and was acting in furtherance of that intent, but she was *also* acting in furtherance of her own long-standing intent to shoot an officer. This latter argument was premised on the 2010 incident discussed supra, during which Petitioner was found hiding in a closet holding a gun aimed at a cop. Petitioner volunteered information to detectives years later, stating, "I took the fuckin' loaded 44, jumped in the closet, pulled it on the cops, and, yes, and gave it to the cops, but, yeah." Id. at 1068. The prosecutor argued that the only reason Petitioner did not follow

through with the shooting then was because she feared being killed. Id. at 945. Per the prosecutor, Petitioner's later statements about the incident revealed that she thought it was "funny. This is something she's proud of. This is something she wants to do, but she didn't want to get shot back. That's not anything different than attempt[ed] murder." Id. at 1076. Fast-forward to the incident with Webb, the prosecutor claimed that Petitioner continued to harbor the same intent, but this time she was going to help someone *else* kill a cop. Id. at 947.

Assuming the prosecutor improperly suggested that mere intent is sufficient for attempted murder, the record reveals that this statement was made during the course of a long closing argument in which the prosecutor correctly and repeatedly stated the requirements for aider and abetter liability. It is also in the context of jury instructions that correctly (see supra) instructed the jury on the law. Under these circumstances, the prosecutor's sole, passing statement at the conclusion of his closing arguments cannot be deemed to have fundamentally undermined the fairness of Petitioner's trial.

For this reason, the Court also finds that Petitioner's ineffective assistance of counsel claim necessarily fails.

## IV. Cumulative Error

Petitioner next argued that the various alleged errors addressed above resulted in cumulative prejudice in violation of her due process rights.

### A. Opinion of the California Court of Appeal

The California appellate court denied Petitioner relief on this claim briefly, noting that since "Defendant does not dispute the sufficiency of the evidence to support the verdicts, and our resolution of her arguments do not require us to assess prejudice (except for her claim regarding the need for a unanimity instruction," then "her claim of cumulative prejudice necessarily fails." People v. McCulley, No. C075333, 2015 WL 1865705, at *1, n.1 (Cal. Ct. App. Apr. 21, 2015).

### B. Discussion

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted

only where the errors infect a trial with unfairness." Peyton v. Cullen, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing Chambers v. Mississippi, 410 U.S. 284, 298, 302-03 (1973)).

As discussed throughout these finding and recommendations, however, Petitioner does not allege any claims that amount to error, and thus Petitioner demonstrates no errors that can accumulate to a level of a constitutional violation. See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002), overruled on other grounds by Slack v. McDaniel, 529 U.S. 973 (2000). "Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible." Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011).

## V. Restitution Award

Lastly, Petitioner argues that the $55,191.41 restitution award to the City of Sacramento violates her rights to due process and jury trial.

### A. Opinion of the California Court of Appeal

The California appellate court denied Petitioner relief on this claim as follows:

> Relying on authority under which a jury must find beyond a reasonable doubt any fact that increases punishment beyond the maximum associated with a conviction (e.g., *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435]), which applies as well to criminal fines (*Southern Union Co. v. United States* (2012) 567 U.S. --- [183 L.Ed.2d 318]), defendant contends the facts supporting the trial court's restitution order come within this principle and the order is consequently infirm for want of jury findings. We do not agree.
>
> Restitution is a substitute remedy for crime victims, which relieves them of the need to file a separate civil action against a defendant. Because it does not represent an increase in *punishment* for the underlying convictions, jury findings are accordingly unnecessary. (*People v. Sweeney* (2014) 228 Cal.App.4th 142, 155; *People v. Pangan* (2013) 213 Cal.App.4th 574, 585; *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1184 [also noting substantial body of federal authority rejecting the argument]; cf. *People v. Millard* (2009) 175 Cal.App.4th 7, 35-36 [restitution as condition of probation].) Defendant acknowledges but disagrees with this authority, noting that our Supreme Court has not yet ruled on the issue. We will adhere to this uniform authority absent contrary direction from the Supreme Court.

People v. McCulley, No. C075333, 2015 WL 1865705, at *10-11 (Cal. Ct. App. Apr. 21, 2015) (emphasis in original).

### B. Discussion

1    Respondent is correct that challenges to restitution orders are not cognizable in federal

2  habeas corpus proceedings because they do not challenge the validity or duration of confinement.

3  Bailey v. Hill, 599 F.3d 976, 979-84 (9th Cir. 2010). Accordingly, Petitioner is not entitled to

4  relief as to her restitution claim.

5                                          **CONCLUSION**

6    For the foregoing reasons, this Court finds that Petitioner has failed to establish a

7  constitutional violation.  Therefore, IT IS HEREBY RECOMMENDED that the petition for a

8  writ of habeas corpus be denied.

9    These findings and recommendations will be submitted to the United States District Judge

10  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

11  after being served with these findings and recommendations, any party may file written

12  objections with the court and serve a copy on all parties. The document should be captioned

13  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

14  objections shall be filed and served within seven days after service of the objections.  The parties

15  are advised that failure to file objections within the specified time may result in waiver of the

16  right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In the

17  objections, the party may address whether a certificate of appealability should issue in the event

18  an appeal of the judgment in this case is filed.  See Rule 11, Rules Governing § 2254 Cases (the

19  district court must issue or deny a certificate of appealability when it enters a final order adverse

20  to the applicant).

21  DATED:  November 20, 2019              /s/ DEBORAH BARNES
                                           UNITED STATES MAGISTRATE JUDGE
22

23

24

25

26  /DLB7
    DB/Inbox/Substantive/mccu2216.fr
27

28